Amelia ROOSEVELT, Appellant,

v.

E.I. DU PONT de NEMOURS
& COMPANY, Appellee.

No. 91–5087.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1991.

Decided March 4, 1992.

Rehearing and Rehearing En Banc
Denied March 25, 1992.

Michael D. Hausfeld, with whom Richard S. Lewis and Cyrus Mehri, Washington, D.C., were on the brief, for appellant.

Daniel M. Gribbon, with whom Steven Semeraro, Washington, D.C., was on the brief, for appellee.

James R. Doty, General Counsel, Katharine Gresham, Asst. General Counsel, with whom Michael G. Lenett, Christopher Paik, and Paul Gonson, Sol., Washington, D.C., were on the brief, for amicus curiae, S.E.C.

Paul M. Neuhauser, Iowa City, Iowa, and David C. Vladeck, Washington, D.C., were on the brief for amicus curiae, Interfaith Center on Corporate Responsibility. Cor-

nish F. Hitchcock, Washington, D.C., also entered an appearance for amicus curiae.

David A. Nicholas and Charles C. Caldart, Boston, Mass., were on the brief for amicus curiae, Nat. Environmental Law Center.

Beth-Ann Roth, Bethesda, Md., was on the brief for amicus curiae, Calvert Social Inv. Fund, Comptroller of the City of New York, and New York City Pension Funds.

Joel T. Thomas, Washington, D.C., was on the brief for amicus curiae, Nat. Wildlife Federation.

Before EDWARDS, RUTH BADER GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge.

Amelia Roosevelt appeals the district court's judgment that E.I. Du Pont de Nemours & Co. ("Du Pont") could omit her shareholder proposal from its proxy materials for the 1992 annual meeting. The district court concluded that Roosevelt's proposal "deals with a matter relating to the conduct of [Du Pont's] ordinary business operations," and is therefore excludable under Securities and Exchange Commission ("SEC") Rule 14a–8(c)(7), 17 C.F.R. § 240.-14a–8(c)(7). We affirm the district court's judgment and deal first with a threshold question. Consistent with congressional intent and Supreme Court case law, we hold, a private right of action is properly implied from section 14(a) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78n(a), to enforce a company's obligation to include shareholder proposals in annual meeting proxy materials. Reaching the merits, we uphold the district court's determination that Roosevelt's two-part proposal is excludable under Rule 14a–8(c)(7).

## I. Background

Prior to Du Pont's 1991 annual shareholder meeting, Friends of the Earth Oceanic Society ("Friends of the Earth") submitted a proposal, on behalf of Roosevelt, regarding: (1) the timing of Du Pont's phase out of the production of chlorofluorocarbons ("CFCs") and halons; and (2) the presentation to shareholders of a report detailing (a) research and development efforts to find environmentally sound substitutes, and (b) marketing plans to sell those substitutes.[1] Du Pont opposed inclusion of the proposal in its proxy materials; as required by SEC rule, see 17 C.F.R. § 240.14a–8(d), the company notified the SEC staff of its intention to omit the proposal and its reasons for believing the omission proper. Friends of the Earth

---

1. Roosevelt's proposal consists of twelve "whereas" clauses followed by two resolutions. In relevant part, the proposal states:

   Whereas, The international scientific community has determined that synthetic chemicals—including chlorofluorocarbons (CFCs), halons, carbon tetrachloride, methyl chloroform, and hydrochlorofluorocarbons (HCFCs)—are destroying the Earth's protective ozone layer at an alarming rate;

   . . . . .

   Whereas, Many governments are taking action beyond the Montreal Protocol [the international ozone protection treaty, including an agreement to stop CFC production in the year 2000]; for example, Germany plans to stop CFC and halon production in 1995, and German CFC producers Hoechst AG and Kali–Chemie have announced they will stop making CFCs in 1995;

   . . . . .

   Resolved, That the shareholders of the Du Pont Company, assembled in annual meeting in person and by proxy, request that the Board of Directors:

   1. Rapidly accelerate plans to phase out CFC and halon production, surpassing our global competitors which have set a 1995 target date;

   2. Present a report to shareholders within six months detailing (a) research and development program expenditures which dramatically increase efforts to find CFC and halon substitutes which do not harm the ozone layer or contribute significantly to global warming; and (b) a marketing plan to sell those environmentally safe alternatives to present customers.

filed with the staff a countersubmission on Roosevelt's behalf urging that the proposal was not excludable.

The SEC staff issued a "no-action letter"; citing the Rule 14a–8(c)(7) exception for matters "relating to the conduct of the [company's] ordinary business operations," [2] the staff stated that it would not recommend Commission enforcement action against Du Pont if the company excluded the proposal. Du Pont, SEC No–Action Letter (available March 8, 1991). Roosevelt did not seek Commission review of the staff's disposition.

Instead, with the 1991 meeting weeks away, Roosevelt filed a complaint and a motion for a temporary restraining order in federal district court. Denying the motion, the motions judge stated preliminarily that "[t]he Supreme Court has recognized an implied private right of action for alleged violations of Rule 14a–8." She found, however, that Roosevelt had not shown the requisite irreparable harm. If Du Pont mailed its proxy materials on March 18, as scheduled, without Roosevelt's proposal, the motions judge observed, a supplemental mailing containing the proposal could still be made in advance of the April 24 annual meeting date. C.A. No. 91–556, Memorandum Order (March 18, 1991) at 1, 3. The trial judge held an expedited trial on the morning of April 2, 1991; in a Memorandum Opinion filed two days later, he

ruled that, based on the "ordinary business operations" exception in Rule 14a–8(c)(7), Du Pont could omit Roosevelt's proposal. C.A. No. 91–556, Memorandum Opinion (April 4, 1991) ("Mem.Op.").

We expedited Roosevelt's appeal when she informed us that she sought inclusion of her proposal in the proxy materials for Du Pont's 1992 annual meeting. C.A. No. 91–5087, Order (April 9, 1991) (per curiam). Before the appeal was heard, Du Pont had again advised the SEC that it intended to exclude the proposal, and the SEC staff had issued a second no-action letter, once more concluding that "[t]here appears to be some basis for [Du Pont's] view that the proposal may be excluded ... pursuant to rule 14a–8(c)(7)." Du Pont, SEC No–Action Letter (available Sept. 11, 1991).[3] Neither Roosevelt nor the SEC staff requested the Commission's view on the applicability of the "ordinary business operations" exception to Roosevelt's proposal.[4]

## II. The Implied Private Right of Action and Shareholder Proposals

Before reviewing the district court's application of Rule 14a–8(c)(7), we resolve a preliminary question: Does a shareholder have an implied right of action under section 14(a) of the Act and Commission Rule 14a–8 when a company refuses to include the shareholder's proposal in proxy materials?

---

**2.** Rule 14a–8, subject to enumerated qualifications, requires companies to include in proxy materials proposals properly submitted by shareholders. Its opening prescription states:

  (a) If any security holder of a registrant notifies the registrant of his intention to present a proposal for action at a forthcoming meeting of the registrant's security holders, the registrant shall set forth the proposal in its proxy statement and identify it in its form of proxy....

17 C.F.R. § 240.14a–8(a). Exceptions concerning the substance of the proposal are listed in Rule 14a–8(c). Section (c)(7) provides:

  (c) The registrant may omit a proposal and any statement in support thereof from its proxy statement and form of proxy under any of the following circumstances:

. . . . .

  (7) If the proposal deals with a matter relating to the conduct of the ordinary business operations of the registrant.

17 C.F.R. § 240.14a–8(c)(7).

**3.** The staff reasoned in September 1991, as it had the previous March, that "the thrust of the proposal appears directed at those questions concerning the timing, research and marketing decisions that involve matters relating to the conduct of the Company's ordinary business operations." *Id.*

**4.** Following oral argument, the court, on its own motion, requested the views of the SEC as amicus curiae on whether a private right of action exists under section 14(a) and Rule 14a–8 and whether all or part of Roosevelt's proposal falls within the exception stated in Commission Rule 14a–8(c)(7). The parties were provided an opportunity to respond in writing to the SEC's brief.

■ The existence of the right of action Roosevelt is pursuing was asserted by the motions judge, *see supra* p. 418, and assumed by all participants in these proceedings until Du Pont, in its answering brief on appeal, presented this boldface argument: "Congress Did Not Create A Private Right Of Action To Enforce The SEC Rule Governing Shareholder Proposals." Brief for Appellee at 32. While it is not our practice to entertain issues first raised on appeal, we regard this case as exceptional.[5] Between the district court's decision and our consideration of the appeal, a relevant Supreme Court decision intervened: *Virginia Bankshares v. Sandberg*, — U.S. —, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). We follow the suggestion contained in *Virginia Bankshares* that, given the "state of evolving definition and uncertainty," an appellate court appropriately answers, and does not bypass, a (preliminary) question of such "importance to the administration of federal law." *See* 111 S.Ct. at 2761 n. 8.

A. Section 14(a) and Supreme Court Case Law on Implied Private Rights

■ A private right of action of the kind Du Pont shareholder Roosevelt asserts has been widely assumed, but scarcely addressed. *See, e.g., Grimes v. Centerior Energy Corp.*, 909 F.2d 529 (D.C.Cir.1990) (right assumed without discussion), *cert.*

*denied*, — U.S. —, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Rauchman v. Mobil Corp.*, 739 F.2d 205, 207–08 (6th Cir.1984) (court assumed private action exists but had "substantial reservations"); *Medical Comm. for Human Rights v. SEC*, 432 F.2d 659, 671–72 (D.C.Cir.1970) (court stated "[t]here is no doubt" that shareholder whose proposal was excluded could seek redress through private action), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *cf. New York City Employees' Retirement System v. American Brands, Inc.*, 634 F.Supp. 1382, 1386 (S.D.N.Y.1986) (*"NYCERS"*) (reasoned determination of existence of implied private right of action by shareholder to enforce company's obligation, under section 14(a) of the Act and Commission Rule 14a–8, to include shareholder proposal in proxy materials). Because the question merits full airing, we have tried to consider it comprehensively.

The Supreme Court first recognized a private right of action under section 14(a) of the Act in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *Borak* involved a merger allegedly infected by a false and misleading proxy statement. The plaintiff shareholder sought rescission or damages citing (1) section 14(a)'s proscription of proxy solicitation in contravention of Commission rules,[6]

---

5. Courts of appeals are not rigidly limited to issues raised in the tribunal of first instance; they have a fair measure of discretion to determine what questions to consider and resolve for the first time on appeal. *See Hormel v. Helvering*, 312 U.S. 552, 555–59, 61 S.Ct. 719, 720–22, 85 L.Ed. 1037 (1941); *Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, 940 F.2d 685, 697 (D.C.Cir.1991) (citing *Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2876–77, 49 L.Ed.2d 826 (1976)). That discretion generally has been exercised to allow consideration of issues not raised earlier only in exceptional circumstances. Qualifying circumstances include: uncertainty in the state of the law, *e.g., Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 325–26 (D.C.Cir.), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); a novel, important, and recurring question of federal law, *e.g., City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 255–57, 101 S.Ct. 2748, 2753–54, 69 L.Ed.2d 616 (1981) (plurality opinion); an intervening change in the law, *e.g., Bolker v. Commissioner of Internal Revenue*, 760 F.2d 1039, 1042 (9th

Cir.1985); and extraordinary situations in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process, *e.g., id.* In the case before us, the issue is purely one of law important in the administration of federal justice, and resolution of the issue does not depend on any additional facts not considered by the district court. *See id.*

6. Section 14(a) of the Act provides:
It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

and (2) Rule 14a–9's ban on false or misleading statements in proxy solicitations.[7] The Court found it "clear" that section 27 of the Act afforded shareholders the requisite right to sue. Section 27 gives the federal district courts exclusive jurisdiction over violations of the Act and "of all suits in equity and actions at law brought to enforce any liability or duty created by [the Act] or the rules and regulations thereunder."[8] *Borak* served as the pathmarking decision for the Court's recognition of implied rights of action under section 14(a) and Rule 14a–9 in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and later in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Over the years since *Borak*, however, the Court has exercised greater restraint in the implication of private rights of action. *Compare Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), *with Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). In *Touche Ross*, the Court unsettled one premise of *Borak*'s reasoning. "Section 27," the Court said, "is a prescription on federal court jurisdiction, venue, and service of process; it "imposes no liabilities" and "creates no cause of action of its own force and effect." *Id.* at 577, 99 S.Ct. at 2489. Nonetheless, the Court preserved *Borak*'s core; it did not "question the actual holding of [the *Borak*] case," *id.*, tied as it was to section 14(a) of the Act. *See id.* at 576, 99 S.Ct. at 2489.

Most recently, the Court refused to extend the *Borak* section 14(a)/Rule 14a–9 right of action to minority shareholders who lacked the votes needed to block the merger that gave rise to the claim. *Virginia Bankshares*, 111 S.Ct. 2749. The Court's opinion in *Virginia Bankshares* recapitulates the *Touche Ross* main theme: "The ultimate question is one of congressional intent." *Touche Ross*, 442 U.S. at 578, 99 S.Ct. at 2490. As restated in *Virginia Bankshares:*

> The rule that has emerged in the years since *Borak* ... is that recognition of any private right of action for violating a federal statute must ultimately rest on congressional intent to provide a private remedy[.]

111 S.Ct. at 2763. The Court indicated a disinclination, however, to disturb a longstanding "legal structure of private statutory rights [that] has developed without clear indications of congressional intent." *Id.* at 2764; *cf. Franklin v. Gwinnett County Public Schools*, — U.S. —, —, 112 S.Ct. 1028, 1030, 117 L.Ed.2d 208 (1992) (Court had "no occasion" to reconsider *Cannon* decision implying right of action and turned directly to "the question of what remedies are available" to redress the implied right). Again, the Court preserved *Borak*, *Virginia Bankshares*, 111 S.Ct. at 2764 n. 11, while noting "the hurdle facing

---

15 U.S.C. § 78n(a).

**7.** SEC Rule 14a–9(a) provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false ·or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9(a).

**8.** Section 27 of the Act provides in relevant part:

The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.... Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.

any litigant" seeking to extend an implied private right to a class with claims not comparable to those previously recognized. 111 S.Ct. at 2764.

We are satisfied on three critical points: first, section 14(a) supports Roosevelt's right of action no less than it supports the right recognized in *Borak;* second, "it would be demonstrably inequitable to [shareholders] with claims comparable to those previously recognized" to deny the right to sue asserted here, *see Virginia Bankshares,* 111 S.Ct. at 2764; and third, such a denial would upset longstanding administrative arrangements and shareholder expectations.

### B. Congressional Intent and Section 14(a)

Because of the primacy of the statutory text to any decision recognizing a private right of action, *see Virginia Bankshares,* 111 S.Ct. at 2764, we turn to section 14(a) and recall that Congress there entrusted to the SEC the prescription of rules and regulations governing proxy solicitations "in the public interest or for the protection of investors." Section 14(a), the SEC judged in framing its rules, warrants the shareholder proposal right the Commission placed in Rule 14a–8. We agree. Access to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import is a right informational in character, one properly derived from section 14(a) and appropriately enforced by private right of action. The right to be informed that Rule 14a–8 affirms is complementary to, although discrete from, the Rule 14a–9 ban on misleading statements in proxy solicitations, the right to accurate information on which the Court focused in *Borak*.

In *Borak,* the Court summarized section 14(a)'s legislative history and observed that it demonstrated Congress' intent to bolster the intelligent exercise of shareholder rights granted by state corporate law:

> [Section 14(a)] stemmed from the congressional belief that *"fair corporate suffrage* is an important right that should attach to every equity security bought on a public exchange." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13. It was intended to "control the conditions under which proxies may be solicited with a view to *preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders."* Id., at 14.

377 U.S. at 431, 84 S.Ct. at 1559 (emphasis added; ellipsis in original). The Court explicitly linked the Rule 14a–9 informational right to the power to control corporate action: "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Id.* Based on this link, *Borak* implied a right of action from section 14(a); under the right implied, a court could award damages when approval for a merger had been obtained by means of a proxy statement that was misleading, and therefore violative of Rule 14a–9. The essential linkage was absent in *Virginia Bankshares,* the Court in that later case explained. Because the complaining shareholders in *Virginia Bankshares* lacked the power to block the merger, the Court allowed no private right of action.[9]

Congress, however, did not narrowly train section 14(a) on the interest of stockholders in receiving information necessary to the intelligent exercise of their approval rights under state law. Beyond that limited frame, section 14(a) shelters use of the proxy solicitation process as a means by which stockholders may become informed about management policies and may com-

---

**9.** The plaintiffs in *Virginia Bankshares* were "member[s] of a class of minority shareholders whose votes [were] not required by law or corporate bylaw to authorize the transaction giving rise to the claim." 111 S.Ct. at 2761. Therefore, they could not meet the causation requirement advanced in *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970):

"[a] solicitation link[ing] a directors' proposal with the votes legally required to authorize the action proposed." *Virginia Bankshares,* 111 S.Ct. at 2763; *see Mills,* 396 U.S. at 385, 90 S.Ct. at 621 (calling the proxy solicitation there at issue an "essential link in the accomplishment of the transaction").

municate with each other. Referring to the House Report cited in support of the *Borak* cause of action, this court once commented: "It is obvious to the point of banality ... that Congress intended by its enactment of section 14 ... to give true vitality to the concept of corporate democracy." *Medical Comm.*, 432 F.2d at 676. The Senate Report similarly indicates this broader purpose: "In order that the stockholder may have adequate knowledge as to the manner in which his interests are being served, it is essential that he be enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings." S.REP. NO. 792, 73d Cong., 2d Sess. 12 (1934). *See also Business Roundtable v. SEC*, 905 F.2d 406, 410 (D.C.Cir.1990) (quoting Senate Report).

In keeping with the Senate Report's statement on section 14(a), the Commission has said of Rule 14a–8:

> Recognizing that, with the increased dispersion of security holdings in public companies, the proxy solicitation process rather than the shareholder's meeting itself had become the forum for shareholder suffrage, the Commission, since 1942, has provided security holders of public companies subject to its proxy regulations a right to have their proposals presented to the issuer's security holders at large and to have proxies with respect to such proposals solicited at little or no expense to the security holder.

*Proposed Amendments to Rule 14a–8*, Exchange Act Release No. 19,135, 47 Fed. Reg. 47,420, 47,420–21 (Oct. 26, 1982) (footnote omitted). *See also Medical Comm.*, 432 F.2d at 677 (noting Commission's recognition that "corporate practice of circulating proxy materials which failed to make reference to the fact that a shareholder intended to present a proposal at the annual meeting rendered the solicitation inherently misleading"); *NYCERS*, 634 F.Supp.

at 1386 ("Since a shareholder may present a proposal at the annual meeting [if state law so allows] regardless of whether the proposal is included in a proxy solicitation, the corporate circulation of proxy materials which fail to make reference to a shareholder's intention to present a proper proposal at the annual meeting renders the solicitation inherently misleading.").[10]

Reminding us that *Borak* recognized a private right of action under section 14(a) *as implemented by Rule 14a–9*, Du Pont stresses that the more recent decisions (*Touche Ross* and *Virginia Bankshares*) counsel against continuing judicial implication of private rights. However, in view of the informational right rooted in section 14(a), we see no instruction in current Supreme Court opinions to "freeze out" private enforcement of Rule 14a–8, a prescription plainly serving the congressional aim to facilitate "corporate democracy." *See Virginia Bankshares*, 111 S.Ct. at 2764 (acknowledging some leeway for "rounding out the scope of an implied private statutory right of action").

We take into account as well the nature of the relief a Rule 14a–8 plaintiff-shareholder seeks—a declaration or injunction requiring inclusion of the shareholder's proposal in the proxy materials mailed by management. *Virginia Bankshares*, by contrast, concerned damage awards for alleged Rule 14a–9 violations. In *Virginia Bankshares* as in *Borak*, the plaintiff sought damages, claiming that the merger was effected at an unfair price and that the price would have been better (or the merger would not have been approved at the unfair price) had the board of directors not made certain misrepresentations. The Court analyzed the claim in two steps. First, the Court asked whether the type of representation sued upon was within the ambit of section 14(a), *see* 111 S.Ct. at 2757–61, and concluded that it was. Second, the Court inquired "whether causation of damages compensable through the im-

---

**10.** The lost informational right itself, and not the damage done because of the failure to adopt any given shareholder proposal, is the injury upon which shareholders invoking section 14(a) and Rule 14a–8 sue. *Cf.* Patrick J. Ryan, *Rule*

*14a–8, Institutional Shareholder Proposals, and Corporate Democracy*, 23 GA.L.REV. 97, 101 (1988) (referring to "consensus understanding" that "typical rule 14a–8 proposal is ... advisory or precatory in nature").

plied right of action under § 14(a) [could] be demonstrated," *see id.* at 2761, and concluded that it could not. The Court rejected the plaintiffs' damages claim based on the alleged "unfairness" of the merger because the complaining shareholders, under no circumstances, could have blocked the merger; therefore, the asserted section 14(a) informational injury and the injury sought to be redressed (through damages) did not mesh. Here, there is no linkage problem—a Rule 14a–8 plaintiff's informational injury (exclusion of her proposal) is precisely the injury that will be redressed by the requested declaratory or injunctive relief.[11]

### C. The SEC's View of the Implied Right

The Commission's view that a private right of action exists under section 14(a) and Rule 14a–8 as well as under Rule 14a–9 coincides with our reading of congressional intent.[12] In support of its view, the SEC refers to its long-standing practices and arrangements. We describe those practices and arrangements for the light they cast on the issue before us.

Staff review of proxy materials, including shareholder proposals, is a concentrated endeavor, based in large part on submissions received during the few months preceding the peak annual meeting season. The review is quick and informal; any advice given in this process is nonbinding for all concerned. *See Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Propos-*

*als,* Exchange Act Release No. 12,599, 41 Fed.Reg. 29,989, 29,991 (July 7, 1976) (*"Informal Procedures"*); Brief of the Securities and Exchange Commission, Amicus Curiae, at 27 n. 22.

Shareholder proposals come to the SEC staff's attention when an issuer, as required by Commission rule, notifies the Commission and the shareholder of the company's decision to omit a tendered proposal and its reasons for the exclusion. *See* 17 C.F.R. § 240.14a–8(d)(4). Prior to deciding whether to issue a no-action letter,[13] the staff may receive submissions from the proposer or other interested persons. Roosevelt, for example, submitted supporting materials both times the staff reviewed her CFC phase-out proposal. Following staff action, either the company or the shareholder may ask for Commission review, but the SEC infrequently grants such requests. *See Informal Procedures*, 41 Fed.Reg. at 29,991 (observing that no prescription directs staff to present requests for review to the Commission). Because the procedure is advisory and yields no definitive ruling, neither the staff's no-action letter, nor the Commission's refusal to review the staff's position, results in an order amenable to judicial review. *See Kixmiller v. SEC*, 492 F.2d 641 (D.C.Cir. 1974) (dismissing petition to review Commission's decision not to review staff's no-action disposition); *see also Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (courts generally lack authority to review agency's enforcement agenda and resource-allocation decisions).[14]

---

**11.** Similarly absent here is the prospect of "speculative claims and procedural intractability" that concerned the Court in *Virginia Bankshares*, 111 S.Ct. at 2765. Citing *Blue Chip Stamps v. Manor Drug Store*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the *Virginia Bankshares* Court expressed concern that a claim for damages would turn on vague allegations of what the board of directors might have done had the minority voted against the merger, notwithstanding the minority's inability to block it. *See* 111 S.Ct. at 2757–58, 2764–66. An action for injunctive or declaratory relief of the kind Roosevelt seeks to maintain asks only whether the proposal was properly submitted and whether it was properly refused, and both issues turn solely on interpretation of section 14(a) and Rule 14a–8.

**12.** Because the Commission rules implement, and do not antedate, section 14(a), it is all the more artificial to attribute to Congress an intent to allow a private remedy for violation of Rule 14a–9, but not for violation of Rule 14a–8.

**13.** The requirement that a company intending to omit a proposal notify the SEC and the proponent "is informational only [and] ... [n]o response by the Commission or its staff is required." *Informal Procedures*, 41 Fed.Reg. at 29,990.

**14.** Commission regulations do state that the staff "will generally present questions to the Commission which involve matters of substantial importance and where the issues are novel or highly complex," and that the Commission's

The Commission has consistently regarded the court, and not the agency, as the formal and binding adjudicator of Rule 14a–8's implementation of section 14(a). Thus, the staff routinely includes this notice in its responses to company requests for no-action letters:

The determination reached by the staff in connection with a shareholder proposal submitted to the Division [of Corporation Finance] under Rule 14a–8 does not and cannot purport to "adjudicate" the merits of the Company's position with respect to the proposal. Only a court such as a U.S. District Court can decide whether a Company is obligated to include shareholder proposals in its proxy material. Accordingly, a discretionary determination by the staff not to recommend enforcement action to the Commission does not preclude a proponent, or any shareholder of a Company, from pursuing any rights he or she may have against the Company in court, should the management omit the proposal from the Company's proxy material.

*See also Informal Procedures,* 41 Fed. Reg. at 29,990 ("[N]othing the Commission or its staff does or omits to do in connection with [shareholder] proposals affects the right of the proponent, or any shareholder for that matter, to institute a private action with respect to the management's intention to omit that proposal from its proxy materials."); *id.* at 29,991 ("The ultimate decision as to whether a shareholder proposal will be omitted from an issuer's proxy materials must be made by the management, although ... that decision is subject to review by a district court [in an action] instituted by either the Commission or the proponent.").

The Commission asks us

to take note of the Commission's inability, with the hundreds of shareholder proposals the staff must review each year and all of the other demands on its limited resources, to enforce [compliance with section 14(a) as implemented by Rule 14a–8] effectively on its own, and the

resulting need for supplementary private enforcement.

Brief of the Securities and Exchange Commission, Amicus Curiae, at 21; *see also id.* at 27 n. 22 ("staff [annually] considers approximately 350 requests for 'no-action' letters relating to shareholder proposals"; "approximately two-thirds of these requests require a response during the period December through March"). The SEC features, in this regard, the Supreme Court's decision in *Cannon,* 441 U.S. 677, 99 S.Ct. 1946. There, in confirming the existence of an implied right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, the Supreme Court counted it persuasive that the Department of Health, Education, and Welfare viewed the private remedy as a vital aid in "achieving the statutory purposes." *Id.,* 441 U.S. at 706–08 & n. 42, 99 S.Ct. at 1962–64 & n. 42; *see also id.* at 702–03, 99 S.Ct. at 1960–61 (persistence among judges, executive officials, and litigants of assumption that implied private right of action exists, and "absence of legislative action to change that assumption provide further evidence that Congress at least acquiesces in ... that assumption").

We place no heavy weight on the Commission's plea that it needs the aid of the court because it is overburdened, for arguments springing from "necessity" will not overcome a negative answer to the question "whether Congress intended to create, either expressly or by implication, a private cause of action." *See Touche Ross,* 442 U.S. at 575–76, 99 S.Ct. at 2488–89; *Virginia Bankshares,* 111 S.Ct. at 2764. We do credit, however, the SEC's consistent interpretation of section 14(a) and Rule 14–8a's implementation of the section. *See United States v. National Ass'n of Securities Dealers, Inc.,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975) (SEC's "consistent and longstanding interpretation" as "the agency charged with administration of the [Investment Company Act of

decision whether to render an informal statement "is entirely within its discretion." 17 C.F.R. § 202.1(d).

We have stated that when the Commission in fact engages in administrative review of a staff

decision, we can review the legal principles or framework on which the Commission's action rests. *Medical Comm.,* 432 F.2d at 674–76.

1940], while not controlling, is entitled to considerable weight."). Furthermore, we accord due respect to the SEC's experience in attempting to carry out the large, but largely undetailed, charge that Congress, through section 14(a), gave to the Commission. *Cf. Virginia Bankshares,* 111 S.Ct. at 2764 (where Congress "was reticent with indications of how far [statute's protective purpose] might depend on self-help by private action," the Court has "looked to policy reasons for deciding where the outer limits of the right should lie"); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (noting that courts "may properly resort for guidance" to agency's "body of experience and informed judgment").

\*   \*   \*

In sum, in view of Congress' intent that section 14(a) have real force, relevant judicial precedent, and the agency's view of the private right, we hold that shareholders may seek appropriate declaratory and injunctive relief when management refuses to distribute their proposals.

### III. Roosevelt's Proposals and the Rule 14a–8(c)(7) Exception for "Ordinary Business Operations"

■ Reaching the merits, we restate the district court's ruling: "Roosevelt's proposal deals with matters relating to the conduct of the ordinary business operations of Du Pont. Therefore, [under Rule 14a–8(c)(7) ], Du Pont properly omitted her proposal from its proxy statement." Mem. Op. at 1. In reviewing this ruling, we emphasize that Roosevelt's disagreement with Du Pont's current policy is not about whether to eliminate CFC production or even whether to do so at once. The former is an end to which Du Pont is committed, and immediate cessation, before environmentally safe alternatives are available, is not what Roosevelt proposes.

Roosevelt differs with Du Pont on a less fundamental matter—the rapidity with which the near-term phase out should occur. Roosevelt seeks a target no later than 1995 ("surpassing [Du Pont's] global competitors which have set a 1995 target date"). In contrast, when this litigation began, Du Pont had set a target of "as soon as possible, but at least by the year 2000." Mem. Op. at 4.

In recent months and days, the "at least by" year has moved ever closer to Roosevelt's target. Prior to oral argument, Roosevelt informed the court, pursuant to Fed.R.App.P. 28(j) and D.C.Cir.R. 11(h), that Du Pont had issued a press release reiterating its "as soon as possible" policy, but "advancing the end point to year-end 1994 for Halons and 1996 for CFCs." Du Pont Corporate News, Oct. 22, 1991, at 1 (citing "scientific data released today by the United Nations Environment Programme ... and World Meteorological Organization"). Following oral argument, Du Pont informed the court that, "[i]n response to an announcement issued by the White House today regarding an accelerated phaseout of CFCs and Halons," the company "will accelerate its CFC end date to no later than December 31, 1995 in developed countries." Du Pont Statement on Accelerated CFC Phaseout, Feb. 12, 1992.[15]

Although the regulation necessary to give effect to the President's announcement has not yet been adopted, Du Pont

---

**15.** *See also* Statement by the Press Secretary, The White House, Feb. 11, 1992 (announcing that, pursuant to the Clean Air Act of 1990, the Administration will eliminate all CFC production in the United States by December 31, 1995, "with certain limited exceptions for essential uses and for servicing existing equipment"). The President's announcement relates to, and will speed up, the statutorily-scheduled January 1, 2000 phase out of CFC production. 42 U.S.C.A. § 7671c(b) (West Supp.1991). Under the Clean Air Act, the Environmental Protection Agency ("EPA") may accelerate that date if, *inter alia,* based on "credible current scientific information," the EPA determines that a more stringent schedule is necessary to protect human health and the environment from harmful ozone effects. *Id.* § 7671e(a)(1). The EPA must effect any change in the phase-out schedule by regulation, which is subject to a period of public notice and comment. *Id.* The regulation that would adopt the President's program has not yet been published in proposed form. The Clean Air Act also provides for certain exceptions from any phase-out schedule, including production of CFCs for necessary medical devices, for export to developing countries, and for national security needs. *See id.* § 7671c(d)(2), (e), & (f).

immediately reported that it "supports the Administration's position," *id.*, and that it will phase out CFC production by December 31, 1995. We accept that public statement as the company's current timetable. While the SEC staff and the district court considered Roosevelt's proposal with the company's year–2000 end point in view, we think it proper to take account of the current reality: Roosevelt's proposal would have Du Pont surpass its global competitors' target of 1995; Du Pont projects completion of the phase out "as soon as possible," but no later than year-end 1995.

Roosevelt has confirmed that the first, or phase-out portion of her proposal is the "core issue" and that, if necessary, she would withdraw the second, or report-to-shareholders portion, so that the first portion could be included in Du Pont's 1992 proxy materials. Plaintiff–Appellant's Reply to Brief of the Securities and Exchange Commission, Amicus Curiae, at 4–5. We therefore consider separately the two portions of Roosevelt's proposal.[16]

Because both parts of Roosevelt's proposal must be measured against the Rule 14a–8(c)(7) "ordinary business operations" exception, we set out here the Commission's general understanding of that phrase. When the Commission adopted the current version of the "ordinary business operations" exception, it announced its intention to interpret the phrase both "more restrictive[ly]" and "more flexibly than in the past." *Adoption of Amendments Relating to Proposals by Security Holders,* Exchange Act Release No. 12,999, 41 Fed. Reg. 52,994, 52,998 (Dec. 3, 1976) ("*1976 Rule 14a–8 Amendments*"). Specifically, the Commission explained:

> [T]he term "ordinary business operations" has been deemed on occasion to include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a proposed nuclear power plant has in the past been considered excludable under [the predecessor of (c)(7)]. In retrospect, however, it seems apparent that the economic and safety considerations attendant to nuclear power plants are of such magnitude that a determination whether to construct one is not an "ordinary" business matter. Accordingly, proposals of that nature, as well as others that have major implications, will in the future be considered beyond the realm of an issuer's ordinary business operations....

*Id.; see Grimes,* 909 F.2d at 531 (observing that, "[u]nfortunately, the phrase [ordinary business operations] has no precise definition"). The Commission contrasted with matters of such moment as a decision not to build a nuclear power plant, "matters ... mundane in nature [that] do not involve any substantial policy ... considerations." *1976 Rule 14a–8 Amendments,* 41 Fed. Reg. at 52,998. Proposals of that genre, the Commission said, may be safely omitted from proxy materials.

In its brief as amicus curiae, the SEC stated that it regarded the first portion of Roosevelt's proposal, on the timing of the CFC phase out, as not excludable under Rule 14a–8(c)(7), but the second part, on

---

**16.** The Commission has informed us that its staff

> issues advice [under Rule 14a–8(c)(7)] with regard to [a shareholder's] proposal as a whole and does not split it into component parts.... Thus, if the staff believes that a major part of a proposal may be omitted, it takes the position that the entire proposal may be omitted. This practice of refusing to give separate consideration to component parts ... is a matter of administrative necessity, given the large number of proposals the staff must consider during a relatively short period each year and the fact that a significant number of those proposals contain several parts.

Brief of the Securities and Exchange Commission, Amicus Curiae, at 26–27 (footnotes omitted). The staff in the instant case wrote in its no-action letters that "[t]here appears to be some basis" for Du Pont's position that "[Roosevelt's] proposal may be excluded ... pursuant to rule 14a–8(c)(7)"; the staff then referred to the proposal's "thrust" as "directed at ... timing, research and marketing decisions." *See supra* note 3. Because the first part of Roosevelt's proposal concerned "timing," and the second, "research and marketing," the staff apparently would have regarded each part, even

research and development programs and marketing plans, as fitting within the "ordinary business operations" exception. Brief of the Securities and Exchange Commission, Amicus Curiae, at 31.[17] The Commission noted that "[its] staff, in contrast, viewed the timing of the phase-out as an ordinary business matter." *Id.* at 32 n. 23. We agree with the Commission on the second part of Roosevelt's proposal but not on the first.

### A. The Phase Out Target Date

It is not debated in this case that CFCs contribute intolerably to depletion of the ozone layer and that their manufacture has caused a grave environmental hazard.[18] However, Roosevelt's proposal, we emphasize again, relates not to *whether* CFC production should be phased out, but *when* the phase out should be completed. *Cf.* Loews Corporation, SEC No–Action Letter (available Feb. 22, 1990) (shareholder proposal for eventual cessation of manufacture of tobacco products; company unsuccessfully urged that what products it makes is a matter of "ordinary business operations").

Timing questions no doubt reflect "significant policy" when large differences are at stake. That would be the case, for example, if Du Pont projected a phase-out period extending into the new century. On the other hand, were Roosevelt seeking to move up Du Pont's target date by barely a season, the matter would appear much more of an "ordinary" than an extraordinary business judgment. In evaluating the

Commission's classification of the timing question here as extraordinary, *i.e.*, one involving "fundamental business strategy" or "long-term goals," *see* Brief of the Securities and Exchange Commission, Amicus Curiae, at 31, we are mindful that the SEC focused on a five-year interval, *see id.* at 32 n. 25, not an interval cut down to one year. *See supra* pp. 425–26.[19]

We are furthermore mindful that we sit in this case as a court of review and owe respect to the findings made by the district court. The trial judge concluded from the record that "Du Pont's 'as soon as possible' policy," contrary to Roosevelt's argument, "does not lack definition." Mem.Op. at 5. The judge found the policy genuine based on evidence that Du Pont had already spent more than $240 million developing alternatives to CFCs and had just announced the shutdown of the facility that had been the largest CFC plant in the world. *Id.* Du Pont, the district court also observed, continues to work "toward a global policy of phasing out CFCs" and "with CFC consumers to phase out their use of CFCs." *Id.*

Stressing the undisputed need for the responsible development of safe substitutes, and the acknowledged irresponsibility of suddenly cutting off all CFC production, the trial judge highlighted the essential difference between this case and the nuclear power plant in the Commission's *1976 Rule 14a–8 Amendments* example. *See supra* p. 426. Phasing out CFC production is not a go/no go matter. *Cf. Medical Comm.*, 432 F.2d at 663 (proposal

---

in isolation, as excludable. The SEC so comprehended its staff's position. *See infra* pp. 426–27.

**17.** The Commission noted that, on occasions when it reviews a staff no-action determination under Rule 14a–8, it acts, as does the staff, on the proposal taken as a whole. Thus, the Commission would have found Roosevelt's entire proposal, as presented, excludable from the proxy materials pursuant to Rule 14a–8(c)(7). However, the court sought the Commission's views on "whether the shareholder proposal at issue, in whole or part, falls within the exception stated in Commission Rule 14a–8(c)(7)"; therefore, the SEC, "to be fully responsive," addressed the parts discretely. *See* Brief of the Securities and Exchange Commission, Amicus Curiae, at 28–29.

**18.** *See, e.g.,* Philip J. Hilts, *Senate Backs Faster Protection of Ozone Layer as Bush Relents,* N.Y.

TIMES, Feb. 7, 1992, at A1, A17 (unanimous Senate resolution to accelerate phase out of CFC and other ozone-harming chemicals). Roosevelt and various amici presented ample (and largely duplicative) argument on this essentially undisputed point.

**19.** As Roosevelt correctly points out, the principle of deference described in *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is not applicable here, for neither the staff's no-action letter nor the Commission's brief ranks as an agency adjudication or rulemaking. *See* Reply Brief at 12–14. Nonetheless, we value the SEC's presentation; the Commission's brief has clarified several points and thereby aided our analysis considerably.

to halt immediately all production of napalm). The phase out takes work "day-to-day ... with equipment manufacturers to help develop the technology needed for alternative compounds." Mem.Op. at 6. It takes careful planning "in sensitive areas, such as the storage of perishable food and medical products (like vaccines and transfusable blood)," and expertise "in technical fields, such as the sterilization of temperature-sensitive surgical instruments." *Id.*

We recognize that "ordinary business operations" ordinarily do not attract the interest of both the executive and legislative branches of the federal government. *See supra* notes 15, 18. But government regulation of the CFC phase out, even the President's headline-attracting decision to accelerate the schedule initially set by Congress, does not automatically elevate shareholder proposals on timing to the status of "significant policy." *See supra* p. 427. What the President and Congress have said about CFCs is not the subject of our closest look. Instead, Rule 14a–8(c)(7) requires us to home in on Roosevelt's proposal, to determine whether her request dominantly implicates ordinary business matters. The gap between her proposal and the company's schedule is now one year, not five. The steps to be taken to accomplish the phase out are complex; as the district court found, the company, having agreed on the essential policy, must carry it out safely, using "business and technical skills" day-to-day that are not meant for "shareholder debate and participation." Mem.Op. at 5, 6.

In sum, the parties agree that CFC production must be phased out, that substitutes must be developed, and that both should be achieved sooner rather than later. Du Pont has undertaken to eliminate the products in question by year-end 1995, and has pledged to do so sooner if "possible." The trial judge has found Du Pont's "as soon as possible" pledge credible. In these circumstances, we conclude that what is at stake is the "implementation of a policy," "the timing for an agreed-upon action," *see* Brief of the Securities and Exchange Commission, Amicus Curiae, at 31, and we therefore hold the target date for the phase out a matter excludable under Rule 14a–8(c)(7).

### B. The Report to Shareholders

■ The second part of Roosevelt's proposal solicits a report from management within six months detailing research and development efforts on environmentally safe substitutes and a marketing plan to sell those substitutes. *See supra* note 1. This portion of the proposal, the SEC concluded in agreement with its staff, "requires detailed information about the company's day-to-day business operations [and] is subject to exclusion pursuant to [Rule 14a–8(c)(7) ]." Brief of the Securities and Exchange Commission, Amicus Curiae, at 31. Roosevelt concedes that the report is not central to her proposal, *see supra* p. 426, and we find no cause to place the matter outside the "ordinary business operations" exception.

For a time, the Commission staff "ha[d] taken the position that proposals requesting issuers to prepare reports on specific aspects of their business or to form [study committees] would not be excludable under Rule 14a–8(c)(7)." *Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders,* Exchange Act Release No. 20,091, 48 Fed.Reg. 38,218, 38,221 (Aug. 23, 1983). The Commission has changed that position. Pointing out that the staff's interpretation "raise[d] form over substance," the Commission instructed the staff to "consider whether the subject matter of the [requested] report or [study] committee involves a matter of ordinary business: where it does, the proposal [is] excludable under Rule 14a–8(c)(7)." *Id.*

We need not linger over the report issue. The staff's no-action letters in this respect are unremarkable and entirely in keeping with current practice. *See, e.g.,* Carolina Power & Light Co., SEC No–Action Letter (available Mar. 8, 1990) (shareholder proposal requesting preparation of a report on specific aspects of company's nuclear operations, covering, *inter alia,* safety, regulatory compliance, emissions problems, hazardous waste disposal and related cost in-

formation, may be omitted as relating to ordinary business operations).

Just as the Commission has clarified that requests for special reports or committee studies are not automatically includable in proxy materials, we caution that such requests are not inevitably excludable. But Roosevelt has not shown that the detailed research and development or marketing information she seeks implicates significant policy issues, and not merely implementation arrangements. She does not, for example, suggest that Du Pont is developing or planning to market hazardous substitutes. *Cf. Lovenheim v. Iroquois Brands, Ltd.*, 618 F.Supp. 554, 556, 561 (D.D.C. 1985) (in light of "ethical and social significance" of proposal, court granted preliminary injunction barring corporation from excluding from its proxy materials shareholder proposal that requested formation of committee to study, and submission of report to shareholders about, whether company's supplier produced pate de foie gras in a manner involving undue pain or suffering to animals and whether distribution of product should be discontinued pending development of a more humane method).

In agreement with the district judge, the Commission, and the staff, we hold that the second part of Roosevelt's proposal falls within the "ordinary business operations" exception.

### Conclusion

A private right of action is properly implied from section 14(a) of the Act, and Commission Rule 14a–8 thereunder, to enforce a registrant's obligation to include a shareholder's proposal in proxy materials mailed out in advance of the annual meeting. Roosevelt's proposal, however, may be excluded by Du Pont because, in both of its parts, the proposal falls within the exception furnished by Rule 14a–8(c)(7) for matters relating to "ordinary business operations." Accordingly, the judgment of the district court is

*Affirmed.*