Jay H. KOPPEL and Arnold E. Greenberg, Plaintiffs–Appellants,

v.

4987 CORPORATION; 498 Seventh Avenue Associates; Peter L. Malkin; Stanley Katzman; John L. Loehr; Martin D. Newman; Wien, Malkin & Bettex and Donald A. Bettex, Defendants–Appellees,

Garment Capitol Associates, Nominal–Defendant–Appellee.

Docket Nos. 98–7026, 98–7048.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1998.

Decided Feb. 5, 1999.

Edward Labaton, Goodkind Labaton Rudoff & Sucharow LLP, New York, N.Y. (Joseph Sternberg, Goodkind Labaton Rudoff & Sucharow LLP, New York; Alan E. Bandler, New York, NY; Gregory K. Arenson, Kaplan, Kilsheimer & Fox LLP, New York, NY; Mark W. Gaffney, Oyster Bay, NY; Philip Gordon, Gordon Law Offices Chartered, Boise, ID, of counsel), for Plaintiffs–Appellants.

Richard P. Swanson, Thelen Reid & Priest LLP, New York, N.Y. (Eli R. Mattioli and Susan L. Bedford, Thelen Reid & Priest LLP, New York, NY; William J. Schwartz and Stephen A. Wieder, Kronish, Lieb, Weiner & Hellman LLP, New York, NY, of counsel), for Defendants–Appellees and Nominal–Defendant–Appellee.

(Harvey J. Goldschmid, David M. Becker, Jacob H. Stillman, Katharine Burdell Gresham, Nathan A. Forrester, and Paul Gonson, Washington, DC, submitted a brief for amicus curiae Securities and Exchange Commission).

Before: CALABRESI and STRAUB, Circuit Judges, and TSOUCALAS, Judge.*

STRAUB, Circuit Judge:

The Plaintiffs–Appellants, Jay H. Koppel and Arnold E. Greenberg, appeal from a judgment of the United States District Court for the Southern District of New York (Robert L. Carter, *Judge* ) dismissing their complaints for failure to state a claim upon which relief may be granted. Both complaints allege violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and several of the rules promulgated thereunder by the Securities and Exchange Commission (the "SEC"). Specifically, Koppel and Greenberg allege that the Defendants–Appellees—a partnership in which the two owned shares, the partnership's agents, and entities related to the partnership—unlawfully solicited shareholder votes in violation of SEC Rules 14a–9, 14a–4(a)(3), and 14a–4(b)(1). We conclude that although the District Court was correct to dismiss some of Koppel and Greenberg's claims under Rule 14a–9, it erred in dismissing both complaints in their entirety. First, we hold that both complaints sufficiently allege a material misrepresentation in a proxy statement in violation of Rule 14a–9 and therefore survive a motion to dismiss. Second, we hold that there is an implied right of action for shareholders under Rules 14a–4(a)(3) and 14a–4(b)(1) and that Greenberg has stated a valid claim for such an action in his complaint.

Accordingly, although we affirm the District Court's dismissal of certain of the Rule 14a–9 claims, we reverse the District Court's

---

* The Honorable Nicholas Tsoucalas, Senior Judge of the United States Court of International Trade, sitting by designation.

## BACKGROUND

■ At the outset, we note that in reviewing a District Court's dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we take as true all well-pled facts alleged in the complaints. *See, e.g., King v. Town of Hempstead,* 161 F.3d 112, 114 (2d Cir.1998) (per curiam); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). Accordingly, this opinion's recitation of the facts derives from the most recent complaints and documents referenced therein. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 46–48 (2d Cir.1991) (permitting consideration of certain documents referred to in the complaint on a motion to dismiss under Rule 12(b)(6)), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

In 1957, three individuals formed a general partnership, Garment Capitol Associates ("Associates"), to raise money to acquire the land and the commercial building located at 498 Seventh Avenue in Manhattan. The three original general partners financed their participation in Associates by selling portions of their respective partnership interests for $10,000 per share to public participants ("Participants") who, by 1995, numbered approximately 908.[1] Under the Participation Agreements, the general partners agreed to serve as agents and trustees for their respective Participants.

By 1978, both Greenberg and Koppel had become Participants. In the years since 1957, the identity of the general partners of Associates has changed, and at various times relevant to the instant litigation, each of the individual Defendants–Appellees was a general partner. The three original partners of Associates as well as the individual Defendants–Appellees have all been partners of the law firm of Wien Malkin & Bettex ("WMB"), also a Defendant–Appellee in the instant case.

The Participation Agreements dictate that the Participants share in the profits and losses of Associates in proportion to their respective interests. The agreements further provide that consent of *all* Participants is required to sell, mortgage, or transfer either a general partner's partnership interest or any partnership asset. If Participants owning ninety percent or more of a general partner's shares consent to such an action, however, the Participation Agreement permits the general partner to buy out the remaining Participants at a price determined by the balance of their capital contribution.

Also in 1957, Associates had executed a long-term net lease of the entire property to Defendant–Appellee 498 Seventh Avenue Associates (the "Original Lessee"), a partnership formed to manage the operations of the property. Under the lease, the Original Lessee paid Associates a fixed monthly rent as well as a commission on the Original Lessee's net income from the property above a certain level. In addition, the lease obligated the Original Lessee to pay all operating expenses of the property, including real estate taxes. At times relevant to this litigation, Defendant–Appellee Peter L. Malkin, one of the general partners of Associates, held a majority interest in the Original Lessee and its successor.

Between 1994 and 1996, the Original Lessee's financial situation deteriorated. Vacancies and low rent rolls resulted in the generation of less income from the property, thereby jeopardizing the Original Lessee's ability to maintain the building and to pay property taxes. Associates concluded that the only viable course of action was to sell the building, and in 1995, it began planning for the sale. As part of the preparations, Associates hired consultants to determine how much of the sale price should be allocated to the Original Lessee to account for its giving up the right to operate the building. The consultants concluded in a report (the "Consensus Report") that a sizable percentage should be transferred to the Original

---

1. The participation interests are securities and were registered under § 12(g) of the Exchange Act, 15 U.S.C. § 78*l* (g).

Lessee in compensation for its leasehold interest.

On December 29, 1995, to insulate its partners from liability, the Original Lessee assigned the net lease to a new corporate entity, 4987 Corporation (the "New Lessee"). The New Lessee's shareholders and their interests corresponded identically with the Original Lessee's partners and therefore included Malkin—also a general partner of Associates—as a majority shareholder. The next business day, January 2, 1996, the New Lessee defaulted on the payment of nearly $1 million in real estate taxes. In July, the New Lessee defaulted again, bringing the total amount of missed tax payments to $2 million.

In response to the defaults, Associates did not cancel the lease, though the defaults constituted clear grounds for doing so. Instead, in order to avoid foreclosure on the property,[2] Malkin and the principals of the New Lessee approached the mortgagee and convinced it to provide a loan to cure the tax default and not to foreclose on the property. In exchange, the mortgagee received first priority on any proceeds from the sale of the building.

On July 26, 1996, Associates distributed to the Participants a letter and a Statement Issued by the Agents in Connection with the Solicitation of Consents of the Participants (the "Solicitation"), both prepared by WMB. The Solicitation sought consent for: (1) continued forbearance from terminating the lease with the New Lessee, (2) sale of the building, (3) distribution of millions of dollars in proceeds from the sale to the New Lessee, and (4) liquidation of Associates after the distribution of the remaining proceeds. Although the Solicitation sought permission in a separate question for the liquidation of Associates, the first three proposals were treated as a single question: whether the Participants approved of the "Sale Program." In support of its allocation of proceeds from the sale of the building, the Solicitation relied on the Consensus Report. While the Participants could access the Consensus Report at the offices of WMB, Associates did not attach a copy to the Solicitation. Eventually over ninety percent of the Participants approved the sale, permitting the general partners to buy out any dissenting Participants and to go forward with the liquidation and the Sale Program.

In October of 1996, Koppel filed his complaint in the Southern District of New York, alleging violations of § 14(a) of the Exchange Act and rules promulgated thereunder as well as state law claims based on fraud and fiduciary breach theories. In March of 1997, Greenberg filed in the same court a similar complaint, which he amended three months later, alleging essentially the same causes of action as Koppel.

In their complaints, Koppel and Greenberg first allege that the Solicitation was misleading in several ways in violation of § 14(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9, promulgated thereunder. Most importantly, they contend that the Solicitation cited to and relied on the Consensus Report misleadingly by using it as support for Associates' proposal to distribute sale proceeds to the New Lessee. Specifically, Koppel and Greenberg claim that the Consensus Report was prepared under the assumption that the New Lessee was in compliance with all of the terms of the lease. Because this was not the case, they assert, the Solicitation's reliance on the Consensus Report suggested misleadingly that the Consensus Report took the New Lessee's default into consideration in arriving at its recommended allocation of proceeds to the New Lessee.

The complaints assert numerous other misrepresentations and omissions in the Solicitation in violation of Rule 14a–9. These include its failure to disclose (1) that the termination of the lease and hiring of new management until the sale of the property would have constituted a better alternative to the Solicitation's proposal; (2) that Associates would have followed that better alternative had its general partners, as the shareholders of the New Lessee, not had a conflict of interest; (3) that the Participation Agreement's ninety percent buyback provision was

---

2. The nonpayment of taxes on the building also constituted a default on the building's mortgage and therefore constituted grounds for foreclosure.

unusually coercive because of the extremely low rate at which the general partner could buy back shares from dissenting Participants; and (4) that WMB's representation of Associates in the transaction proposed in the Solicitation presented an inherent conflict of interest.

Finally, Greenberg's complaint asserts that the three questions presented in the Solicitation under the heading of "Sale Program" each constituted a separate matter, requiring individual votes pursuant to Rules 14a–4(a)(3) and 14a–4(b)(1), 17 C.F.R. §§ 240.14a–4(a)(3) & 240.14a–4(b)(1).[3]

In response to the complaints, the Defendants–Appellees filed motions to dismiss the complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). The District Court treated the motions together, granting them both in their entirety. *See Koppel v. 4987 Corp.,* [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,126, 1997 WL 760512 (S.D.N.Y. Dec. 9, 1997).

The District Court first addressed Koppel and Greenberg's claims under Rule 14a–9, finding that none of them constituted material misrepresentations or omissions. *See id.* at 90,221–23, 1997 WL 760512, at *2–*5. It concluded that the complaints' allegations about Associates' not having disclosed alternatives or having given bad advice are simply not the sort of misrepresentations at which § 14(a) is aimed. *See id.* at 90,221–22, 1997 WL 760512, at *3. The District Court then also rejected Koppel and Greenberg's contention that the ninety percent buyback provision was a violation of the securities laws because each Participant had consented to the provision after full disclosure. *See id.* at 90,222, 1997 WL 760512, at *3. The District Court went on to hold that the use of the Consensus Report was not misleading because the Consensus Report had been available for inspection and because it forthrightly described its limited purpose. *See id.* at 90,222–23, 1997 WL 760512, at *4. Finally the District Court rejected the contention that the Solicitation could have been materially false or misleading only "because no reason-

able person could conclude that the best alternative ... was to allow the defaulting New Lessee to continue to operate the Building, and to forbear from canceling the Net Lease"; the court determined that in the absence of an allegation of a material omission or misleading fact to support it, such a claim is not cognizable under the securities laws. *Id.* at 90,223, 1997 WL 760512, at *5.

In the second part of its opinion, the District Court held that Rules 14a–4(a)(3) and 14a–4(b)(1) do not provide a private right of action for the violation alleged here—failure to divide the Solicitation into distinct voting selections. The court held that this alleged violation does not "rise to the level of warranting a new private cause of action." *Id.,* 1997 WL 760512, at *5–6. Then, having dismissed Koppel and Greenberg's only federal claims, the District Court dismissed the pendant state claims for lack of subject matter jurisdiction and all other outstanding motions as moot. *See id.* at 90,223–24, 1997 WL 760512, at *6.

Koppel and Greenberg now appeal.

## DISCUSSION

■ This Court reviews a grant of a motion to dismiss *de novo,* "taking as true all allegations in the complaint, and drawing all reasonable inferences therefrom in the investors' favor." *Lanza v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. Partnerships Litig.),* 154 F.3d 56, 58 (2d Cir.1998) (per curiam) (citing *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 4–5 (2d Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2433, 138 L.Ed.2d 194 (1997)). We must "vacate the dismissal 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 110 (2d Cir.1998) (quoting *Easton v. Sundram,* 947 F.2d 1011, 1014–1015 (2d Cir.1991) (quotation marks omitted and alterations made in *U.S. Envtl.*), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992)).

---

**3.** The complaints also allege various state law causes of action, the substance of which is not relevant for purposes of this appeal.

## I. Rule 14a–9 and Material Misstatements or Omissions in a Proxy Statement

We first address whether the complaints state a valid cause of action for a material misstatement or omission in a proxy statement in violation of § 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder. As discussed below, the District Court did correctly dismiss many of the 14a–9 claims. Nonetheless, it erred in dismissing the complaints in their entirety. Specifically, Koppel and Greenberg both plead a valid claim under Rule 14a–9 in alleging that the Solicitation's use of the Consensus Report was misleading. Accordingly, we reverse the District Court's decision to the contrary.

■■■ Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person ... in contravention of such rules and regulations as the [SEC] may prescribe ... to solicit ... any proxy or consent or authorization in respect of any security ... registered pursuant to ... this title." Exchange Act § 14(a), 15 U.S.C. § 78n(a). Rule 14a–9(a) promulgated thereunder provides that:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

17 C.F.R. § 240.14a–9(a). "A fact is material for purposes of Rule 14a–9 ' "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." ' " *United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.1993) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (in turn quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976))). " ' "Once the proxy statement purport[s] to disclose the factors considered [by the board of directors] ..., there [i]s an obligation to portray them accurately." ' " *Id.* (quoting

*Virginia Bankshares*, 501 U.S. at 1098 n. 7, 111 S.Ct. 2749 (in turn quoting *Berg v. First Am. Bankshares, Inc.*, 796 F.2d 489, 496 (D.C.Cir.1986))).

■■■ A private right of action under Rule 14a–9 is well established. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *United Paperworkers Int'l Union*, 985 F.2d at 1197–98.

### A. The Consensus Report

■■■ Both complaints allege that the Solicitation misleadingly relied on the Consensus Report, leaving the impression that the Consensus Report's recommendations took the New Lessee's default into consideration. In fact, Koppel and Greenberg assert, the consulting firms had prepared the Consensus Report without the knowledge that the New Lessee had defaulted; as a result, the Consensus Report had little relevance to a determination of the proper allocation of sale proceeds. As explained below, although we express no opinion on the ultimate outcome on the issue, these allegations do make out a valid claim for a violation of § 14(a) and Rule 14a–9 and suffice to survive a motion to dismiss.

■■■ As a threshold matter, we must sketch the boundaries of the information that we may consider in deciding whether the Solicitation is misleading. Specifically, the District Court had requested the Consensus Report itself from the Defendants–Appellees, and had considered it in reaching its decision. *See Koppel*, [1998 Transfer Binder] Fed. Sec. L. Rep. at 90,222–23, 1997 WL 760512, at *4. We hold that because the Consensus Report was not part of the "total mix" of information available to investors, it was improper for the District Court to have considered the report's contents in making its determination on the motion to dismiss.

■■■ A plaintiff asserting a claim for a material omission under Rule 14a–9 "must show that there was 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *United Paperworkers Int'l Union*, 985 F.2d at 1198

(quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). The "total mix" includes only information "reasonably available to the shareholders." *Id.* (quoting *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir.1979)). In this respect, "[c]orporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders." *Id.* at 1199.

This case does not present us with an instance to look beyond the Solicitation to consider the Consensus Report as part of the total mix of information available to the Participants. The Solicitation did note that "[t]he Consensus Report is available for inspection and copying *at the offices* of [WMB] (on behalf of Associates) ... *during regular business hours* by any Participant or his [or her] representative who has been so designated in writing" (emphasis added). This limited opportunity to review the report at one location, however, does not alone constitute ready availability for most Participants. The difficulty of obtaining the Consensus Report—particularly for those Participants who do not live in New York City, where WMB is located—speaks strongly against consideration of its contents in determining whether the Solicitation itself was materially false or misleading. Moreover, the Solicitation clearly explained that "[t]here is no document not included herewith which is incorporated by reference." This statement and the difficulty of reviewing the Consensus Report together dictate that we not consider the report as part of the total mix available to investors.

Such a result comports with the policy behind the "total mix" approach. Specifically, we explained in *Seibert v. Sperry Rand Corp.*, 586 F.2d 949 (2d Cir.1978), that the purpose of looking at the sum of all information "reasonably available" is to enable a registrant to rely on a "'reasonable belief that the other party already has access to the facts [to] excuse him from new disclosures which reasonably appear to be repetitive.'" *Id.* at 952 (quoting *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975)). Because it is extremely unlikely that any of the Participants had already had access to the Consensus Report, it is sensible in this case not to consider the report itself in our inquiry. We do note, however, that even if we could permissibly consider the Consensus Report, the conclusion we reach below would not change.

Turning to the Solicitation itself, we observe that it relied extensively on the conclusions reached in the Consensus Report in its discussion of how to distribute the sale proceeds. The Solicitation discussed only briefly the methodology behind the preparation of the Consensus Report:

> The proposed allocation of the sale proceeds between the fee and leasehold interests was based primarily upon (a) assumptions of potential sales prices, (b) the determination of the projected net income required to justify the assumed sales prices, reflecting as well appropriate capitalization rates and capital costs, and (c) the apportioning of the Property's total estimated income between the fee interest and the leasehold in accordance with the Operating Lease. The only special instruction provided to the two consulting firms in seeking their consensus was that they assume that the Property would be sold as a unified whole rather than as separate interests. Their methodology required that they assume a minimum sales price of $20,000,000 for the Property.

At no point did the Solicitation provide more explicit guidance on whether the Consensus Report had assumed that the lessee was or was not in default. Other portions of the Solicitation do, however, deal explicitly with the New Lessee's default in the context of Associates' proposal not to terminate the lease.

The complaints allege that the most natural reading of the Solicitation would therefore suggest that the Consensus Report was prepared with complete knowledge of the material facts, and that the New Lessee's default was a material fact. That is, Koppel and Greenberg do not suggest that the Solicitation misled them as to the New Lessee's being in default or as to Associates' resulting ability to terminate the lease. Indeed the Solicitation was completely clear on these

points. Rather, they argue that the Solicitation implied that the Consensus Report—the independent recommendation upon which the Solicitation relied heavily to support the proposed distribution of sale proceeds—had been prepared with that same knowledge when in fact it had not. Although this reading may not be the only plausible interpretation of the Solicitation, it certainly is a permissible way of interpreting its reference to the Consensus Report.

Thus, construing the Solicitation in the light most favorable to Koppel and Greenberg—as we must on a motion to dismiss—their allegation suffices to state a claim under § 14(a) and Rule 14a–9. If a trier of fact agreed with the complaints' plausible interpretation of the Solicitation, Associates' misleading reliance on the Consensus Report could constitute a material misrepresentation or omission. That is, a trier of fact could conclude that reasonable investors would find information about the Consensus Report's assumptions about the New Lessee's default to be important to their decision on how to vote. *Cf. Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) ("[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

■ In this respect, we note the District Court's unfortunate choice of words in its opinion, which might suggest that it did not apply the proper standard for a motion to dismiss under Rule 12(b)(6). Specifically, the District Court's opinion appeared in several instances to require Koppel and Greenberg to *prove* sufficient facts or to *produce* evidence to prove their claims. *See, e.g., Koppel,* [1998 Transfer Binder] Fed. Sec. L. Rep. at 90,223, 1997 WL 760512, at *5 ("[P]laintiffs have provided insufficient evidence to show that the Solicitation was materially false or misleading."). A plaintiff, of course, need only *allege,* not *prove,* sufficient facts to survive a motion to dismiss. The root of the District Court's error in this case, however, was not the application of the wrong standard, but rather its simply not accepting the potentially misleading nature of the Solicitation's portrayal of the Consensus Report.

Again, we do not suggest that the complaints describe the only plausible reading of the Solicitation. For example, even if Koppel and Greenberg were to introduce evidence supporting the facts they allege, a trier of fact may well conclude that the Solicitation *does* imply that the Consensus Report did not seek to consider the New Lessee's default. In other words, the Solicitation's mentioning that the firms that prepared the Consensus Report received only one "special instruction" may suggest that Associates told the firms little else about the individual circumstances of the situation. A trier of fact may conclude that the Solicitation presented the Consensus Report as no more than a generic allocation of proceeds between a building owner and an operating lessee with a lease of a certain term.

It is not for us, however, to choose among the two or more plausible readings of the Solicitation in reviewing the Defendants–Appellees' motion to dismiss. Instead, because we find Koppel and Greenberg's reading to be among those plausible readings, we must reverse the District Court's dismissal of these claims.

### B. *Other Rule 14a–9 Claims*

■ The District Court did properly dismiss Koppel and Greenberg's claims under Rule 14a–9 as they relate to many of the other alleged misstatements and omissions described in the complaints. These claims include allegations that Associates did not recommend a more cost-effective alternative to the Sale Program, that Associates failed to disclose potential conflicts of interest, and that the Participation Agreement's buyback provision was unreasonably coercive. Concluding that these allegations constitute no more than state law breach of fiduciary duty claims under a thin coat of federal paint, we affirm the District Court's dismissal of the claims relating to them.

■ We have long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty.

*See Field v. Trump,* 850 F.2d 938, 947 (2d Cir.1988) (quoting *Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979)), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *cf. Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (refusing to construe § 10(b) to prohibit "instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary"). Although the Supreme Court has explained that explicit, conclusory statements concerning the wisdom of a proposed action are actionable, *see generally Virginia Bankshares,* 501 U.S. 1083, 111 S.Ct. 2749, there is no § 14(a) violation for merely failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders: "Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading." *Id.* at 1098 n. 7, 111 S.Ct. 2749. The securities laws do not "effectively require [an issuer] to accuse [it-]sel[f] of breach of fiduciary duty." *Id.*

Thus, to the extent that Koppel and Greenberg have been harmed by any of the other alleged misstatements and omissions described in their complaints, they may seek their remedies through state fiduciary breach law, not through federal securities law. Though it is true that the presence of a potential state law action does not preclude a federal securities action, *see Field v. Trump,* 850 F.2d at 948 (quoting *Goldberg v. Meridor,* 567 F.2d 209, 220 (2d Cir.1977) (Friendly, J.), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)), here there is simply no misrepresentation or omission of material facts other than the omission of the sorts of self-accusation that *Virginia Bankshares* does not require a registrant to make. Accordingly there is no basis for a federal cause of action on those claims, despite the generous standard of Rule 12(b)(6) motions, and therefore the District Court properly dismissed them.

## II. *Greenberg's Claim Under Rules 14a–4(a)(3) and 14a–4(b)(1)*

Greenberg's complaint also asserts that the Defendants–Appellees violated the SEC's Rules 14a–4(a)(3) and 14a–4(b)(1) by impermissibly grouping several matters in one vote in the Solicitation. Specifically, his complaint alleges that the Solicitation violated the two antibundling rules by requiring a single yes or no vote on the Sale Program, which included: (1) forbearing from terminating the net lease, (2) selling the building, and (3) distributing the proceeds from the sale as proposed. Greenberg asserts that this grouping does not permit the Participants to approve the sale of the building without also approving the allegedly improper distribution of funds to the New Lessee. As explained below, we hold that the two rules provide an implied right of action, under which Greenberg's complaint pleads a valid claim. Accordingly, we reverse the portion of the District Court's ruling that reaches the opposite conclusion.

Rules 14a–4(a)(3) and 14a–4(b)(1) provide technical requirements for the form that proxy statements must take. Rule 14a–4(a)(3) requires that a proxy "[s]hall identify clearly and impartially *each separate matter* intended to be acted upon, whether or not related to or conditioned on the approval of other matters, and whether proposed by the registrant or by security holders." 17 C.F.R. § 240.14a–4(a)(3) (emphasis added). Relatedly, Rule 14a–4(b)(1) provides that "[m]eans shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to *each separate matter* referred to therein as intended to be acted upon, other than elections to office." *Id.* § 240.14a–4(b)(1) (emphasis added).

### A. *Implied Right of Action*

We must first determine whether an implied private right of action exists under § 14(a) for violations of Rules 14a–4(a)(3) and 14a–4(b)(1). This is a question of first impression in this Circuit, and to our knowledge none of our sister Circuits has addressed this precise question either.

The Supreme Court first recognized a private right of action under § 14(a) in *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12

L.Ed.2d 423 (1964), when it permitted a private action for a violation of Rule 14a–9. After *Borak*, the Court continued to recognize implied rights of action under § 14(a) and Rule 14a–9 in *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In the years since *TSC Industries*, however, the Supreme Court "has exercised greater restraint in the implication of private rights of action." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 420 (D.C.Cir.1992) (Ruth Bader Ginsburg, J.). In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court began to limit *Borak*'s reach: Although it preserved the actual holding of *Borak*, the Court noted that § 27 of the Exchange Act "creates no cause of action of its own force and effect." *Id.* at 577, 99 S.Ct. 2479. In doing so, the Court in *Touche Ross* explained that "[t]he ultimate question [in finding implied private rights of action] is one of congressional intent." *Id.* at 578, 99 S.Ct. 2479.

In *Virginia Bankshares*, the Court followed *Touche Ross* and declined to extend *Borak*'s private right of action under Rule 14a–9 to a class of minority shareholders whose votes were not required by law or corporate bylaw. *Virginia Bankshares* reiterated that generally the determination of whether an implied private right of action lies under a statute "must ultimately rest on congressional intent to provide a private remedy." 501 U.S. at 1102, 111 S.Ct. 2749. The Court reasoned further that "the breadth of the right once recognized should not, as a general matter, grow beyond the scope congressionally intended." *Id.*

Nevertheless, the Court in *Virginia Bankshares* acknowledged that its implied private right of action jurisprudence for § 14(a), beginning with *Borak* in 1964, predates the Court's more recent focus on congressional intent and is not entirely consistent with that focus. *See id.* at 1102–05, 111 S.Ct. 2749. It explained that although Congress did clearly intend in § 14(a) to "protect '[f]air corporate suffrage,'" *id.* at 1103, 111 S.Ct. 2749 (quoting H.R.Rep. No. 73–1383, at 13 (1934)),

"Congress was reticent with indications of how far this protection might depend on self-help by private action," *id.* at 1103–04, 111 S.Ct. 2749. Because the Court did not, however, wish to reexamine *Borak* and its progeny, *see id.* at 1104 n. 11, 111 S.Ct. 2749, it endorsed a modified approach to implied private rights of action under § 14(a):

> [W]here a legal structure of private statutory rights has developed without clear indications of congressional intent, the contours of that structure need not be frozen absolutely when the result would be demonstrably inequitable to a class of would-be plaintiffs with claims comparable to those previously recognized. Faced ... with such a claim for equality in rounding out the scope of an implied private statutory right of action, we look[ ] to policy reasons for deciding where the outer limits of the rights should lie.

*Id.* at 1104–05, 111 S.Ct. 2749; *accord Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). As detailed below, under this approach a private right of action for the antibundling rules is appropriate. That is, such a right comports generally with the congressional intent identified in *Borak*, falls within the contours of similar private rights of action granted by the Supreme Court and other Circuits, and does not raise the policy concerns that motivated the Court to decline to extend a private right of action in *Virginia Bankshares*.

The congressional intent on which the Supreme Court relied to support a private right of action in *Borak* supports the implication of a private right of action under Rules 14a–4(a)(3) and (b)(1) with equal vigor. The *Borak* Court explained that § 14(a) "stemmed from the congressional belief that '[f]air corporate suffrage is an important right ...', [and i]t was intended to 'control the conditions under which proxies may be solicited with a view to *preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders.'*" 377 U.S. at 431, 84 S.Ct. 1555 (quoting H.R.Rep. No. 73–1383, at 13, 14) (emphasis added) (first and third alterations in original). Impermissible grouping of vot-

ing items frustrates fair corporate suffrage and the voting rights of shareholders no less than a misrepresentation or omission in a proxy. To the extent that the District Court construed *Borak* and later cases to permit private rights of action "only [for] SEC rule violations which implicate ... full disclosure concerns," *Koppel,* [1998 Transfer Binder] Fed. Sec. L. Rep. at 90,223, 1997 WL 760512, at *6, it read the cases too narrowly. The rights that the two rules seek to protect are "complementary to, although discrete from, the Rule 14a–9 ban on misleading statements in proxy solicitations." *Roosevelt,* 958 F.2d at 421.

Similarly, the SEC sought to serve the same goals of promoting fair corporate suffrage and protecting the voting rights of shareholders when it promulgated the current version of the rules. *See* Regulation of Communications Among Shareholders, Exchange Act Release No. 34–31326, 57 Fed. Reg. 48,276, 48,287 (Oct. 22, 1992) (describing as one goal of the rules "prohibit[ing] electoral tying arrangements that restrict shareholder voting choices"); Regulation of Communications Among Securityholders, Exchange Act Release No. 34–30849, 57 Fed. Reg. 29,564, 29,566 (July 2, 1992) ("The purpose of the Commission's proposal is to permit shareholders to communicate to the board of directors their views on each of the matters put to a vote...."). It is true that the SEC's view does not constitute a substitute for congressional intent for purposes of implied rights of action. Even so, its view of the rules does indicate the extent to which the intent behind the rules—which the statute expressly authorizes the SEC to create—matches the intent behind the legislation. In addition, the more the intent behind the promulgation of the antibundling rules matches the congressional intent identified in *Borak,* the less sense it would make to allow a private right of action for Rule 14a–9 (as *Borak* did) and not allow one for the antibundling rules. This is particularly so in light of the fact that both Rule 14a–9 and the antibundling rules serve only to "implement, and do not antedate, section 14(a)." *Roosevelt,* 958 F.2d at 423 n. 12.

In further support of an implied right of action under Rules 14a–4(a)(3) and (b)(1), several of our sister Circuits have endorsed private rights of action for other rules under § 14(a) based on similar reasoning. *See, e.g., id.* at 421–25 (finding right of action under Rule 14a–8's requirement that a registrant present certain shareholder proposals in its proxies); *Haas v. Wieboldt Stores, Inc.,* 725 F.2d 71, 73–74 (7th Cir.1984) (permitting private right of action under Rule 14a–7's requirement that a registrant mail shareholder proxy proposals); *cf. Rauchman v. Mobil Corp.,* 739 F.2d 205, 207–08 (6th Cir.1984) (assuming existence of right of action under Rule 14a–8 but expressing reservations). Moreover, we are aware of no Circuit that has refused to do so. And although we have not considered this precise question in this Circuit, we have noted that "the Court [in *Virginia Bankshares* ] declared that implied rights outside the contours of that recognized in *Mills might* exist under § 14(a)." *Wilson v. Great Am. Indus., Inc.,* 979 F.2d 924, 929 (2d Cir.1992). Thus, in addition to its harmony with the Congressional intent described in *Borak,* an implied private right of action under Rules 14a–4(a)(3) and 14a–4(b)(1) fits well within the boundaries described by the cases in this and other Circuits. In this respect, not permitting such an action "would be demonstrably inequitable to a class of would-be plaintiffs with claims comparable to those previously recognized." *Virginia Bankshares,* 501 U.S. at 1104, 111 S.Ct. 2749.

Finally, as instructed by the Supreme Court in *Virginia Bankshares,* we "look[ ] to policy reasons for deciding where the outer limits of the [implied right of action under § 14(a) ] should lie." 501 U.S. at 1104–05, 111 S.Ct. 2749. In so doing, we first note that the SEC has made clear through its submissions to this Court that it "needs private actions as a supplement to its efforts to enforce Rule 14a–4's separate matter requirement due to its limited staff resources." Letter from Harvey J. Goldschmid, General Counsel, SEC, to Lucille Carr, Operations Manager, United States Court of Appeals for the Second Circuit 1 (Nov. 18, 1998). Although "[w]e place no heavy weight on the [SEC]'s plea that it needs the aid of the court because it is overburdened," *Roosevelt,* 958

F.2d at 424, the practicalities of the SEC's abilities to enforce its rules do add further support for the implication of a private right of action for Rules 14a–4(a)(3) and 14a–4(b)(1).

On a related note, the instant case does not raise the policy concerns on which the Court in *Virginia Bankshares* relied to halt the growth of the private right under Rule 14a–9. The shareholders' causation problems in *Virginia Bankshares* arose because their votes were not required by law or corporate bylaw for the complained-of corporate action to proceed. *See* 501 U.S. at 1099, 111 S.Ct. 2749. Thus, the *Virginia Bankshares* respondents' claims depended upon a finding that a corporation's directors *would have* declined to follow their course of action without minority approval, even though that approval was not required by law. *See id.* at 1105, 111 S.Ct. 2749. The Court rejected such a theory, noting that in such an action "[t]he issues would be hazy, their litigation protracted, and their resolution unreliable." *Id.* at 1106, 111 S.Ct. 2749; *see also Blue Chip Stamps,* 421 U.S. at 742–43, 95 S.Ct. 1917 (reaching a similar conclusion in response to a similar theory involving hypothetical buyers and sellers under Rule 10b–5). This concern is not present in the instant case. It has long been clear that a plaintiff alleges sufficient causation when the plaintiff points to a material violation of the proxy rules in a situation where shareholder approval was necessary for a company to complete an allegedly unfavorable transaction. *See Virginia Bankshares,* 501 U.S. at 1099–1100, 111 S.Ct. 2749 (discussing *Mills,* 396 U.S. at 384–85, 90 S.Ct. 616 (holding that a determination of materiality of the defect in solicitation materials can alone establish causation in cases where a shareholder vote is necessary)); 9 Louis Loss & Joel Seligman, Securities Regulation 4356 (3d ed.1992). Greenberg has clearly done so here: Associates required approval of at least ninety percent of the Participants in order to complete the sale of the building.

In our earlier cases, we have described two components of causation in the context of securities litigation: transaction causation and loss causation. *See, e.g, Wilson,* 979 F.2d at 931. The type of causation at issue in *Virginia Bankshares* is a version of transaction causation, focusing on whether the alleged misstatements resulted in shareholders' voting for the challenged transaction; as explained above, Greenberg properly alleges this type of transaction causation under *Mills.* He also properly alleges loss causation—or economic loss, *see, e.g., Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 381 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)—in arguing that he would have received a greater share of the proceeds from the sale if the Solicitation had not impermissibly grouped the votes under the Sale Program. That is, Greenberg asserts plausibly that Associates would have continued with the sale of the property even if it had not received shareholder approval for its decision not to terminate the lease and for its allegedly improper distribution of proceeds. Such an allegation is sufficient to survive a motion to dismiss.

We do point out that *Virginia Bankshares'* attention to causation will serve to keep out more speculative claims than the one at bar. That is, *Virginia Bankshares'* limitations on the *types* of shareholders that may bring actions under Rules 14a–9 would appear to apply with equal strength to actions under Rules 14a–4(a)(3) and 14a–4(b)(1). This case, however, raises no such concerns.

We conclude by noting that this opinion makes no determination as to exactly what measure of damages might be appropriate if Greenberg's claim were successful. In that respect, we do have a strong preference for an injunctive remedy over damages for violations of the proxy rules. *Cf. Roosevelt,* 958 F.2d at 422 (distinguishing *Virginia Bankshares* in part by noting that it involved a damages remedy as opposed to the preferred injunctive remedy). The reasons for such a preference are sound: The courts should provide parties with no encouragement to sit on live claims until after a shareholder vote, hoping to collect damages and attorneys' fees from proxy violations that a registrant might willingly correct before the vote. Nevertheless, there are certainly cases that state a valid claim under the antibundling rules in

which an injunctive remedy is an impossibility. Such cases might well include actions—such as this one—which also state a valid cause of action for a misrepresentation or omission on a proxy. In some such cases, it may simply be impossible for a party to recognize the import of a bundling violation before the vote takes place as a result of the misleading proxy.

## B. *Greenberg's Claim*

■ Having held that a private right of action does exist under Rules 14a–4(a)(3) and 14a–4(b)(1) in the general circumstances alleged by Greenberg, we must next determine whether the specific facts he alleges constitute a violation of the rules themselves. Considering the allegations in the generous light cast by Rule 12(b)(6), we conclude that they do.

Both of the rules at issue require distinct voting items on "each separate matter." 17 C.F.R. § 240.14a–4(a)(3) & (b)(1). Thus, the question in this case is whether Greenberg has alleged facts sufficient to establish that at least two of the three items grouped within the "Sale Program" constitute "separate matters." This inquiry too provides us with a case of first impression in this and other Circuits.

■ Although there are no cases to guide us, the SEC has provided some indication as to how the rules should be interpreted through its commentary on the promulgation of the most recent version of the antibundling rules. *See* Regulation of Communications Among Shareholders, 57 Fed.Reg. at 48,287. And as a general matter, an agency's interpretation of its own regulations is of " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). In the commentary, the SEC recognized that the new rules were specifically intended to " 'unbundle' management proposals" and that those individual voting items may well constitute closely related matters. Regulation of Communications Among Shareholders, 57 Fed.Reg. at 48,287. Indeed, the commentary recognized that under the rules, management may still "condition[ ] the effectiveness of any proposal on the adoption of one or more other proposals, if permitted by state law"; in such a case, however, the rules require unbendingly that the proposals remain as separate voting items on the proxy. *Id.* Thus, the commentary suggests a strong preference for more voting items rather than fewer.

■ We hold that in the absence of explicit guidance from the applicable state law, the actual issue of what constitutes a "separate matter" for purposes of the two rules is ultimately a question of fact to be determined in light of the corporate documents and in consideration of the SEC's apparent preference for more voting items rather than fewer. In this case, Greenberg has sufficiently alleged that at least two of the items grouped together constitute separate items for purposes of Rules 14a–4(a)(3) and 14a–4(b)(1). First, the Solicitation itself presents its Sale Program in the form of three interrelated proposals; this alone suggests the separability of each item. More importantly, the document on which the partnership was founded, the Participation Agreement, would have required a vote for each prong if at least two prongs of the Sale Program were attempted individually. The Participation Agreement provides that "[t]he Agent shall not agree to sell, mortgage or transfer The Property or the premises, nor to make or modify any mortgage or lease of the premises, nor to dispose of any partnership asset, without the consent of all the Participants." Obviously, selling the building constitutes disposal of a partnership asset and therefore would require its own vote if Associates sought to complete the sale only. Similarly, it is at least plausible that Associates' decision not to cancel the lease constitutes a "modif[ication]" of a "mortgage or lease of the premises," and thus would also require shareholder approval under the Participation Agreement.

Again, however, we need not make a determination on whether there was an actual violation here, only whether Greenberg has alleged facts sufficient to survive a motion to dismiss. Given the facts alleged combined with the Solicitation and the Participation

Agreement themselves, we hold that he has met that burden.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the District Court's dismissal of Koppel and Greenberg's federal claims. In addition, the District Court dismissed Koppel and Greenberg's state law claims because, after the court had dismissed the federal securities claims, there was no federal claim to which the state law claims could be appended. *See Koppel v. 4987 Corp.*, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,126, at 90,223, 1997 WL 760512, at *6. Because our decision nullifies that rationale, we also reverse the District Court's dismissal of Koppel and Greenberg's state claims. We therefore remand for further proceedings consistent with this opinion and instruct the District Court to reconsider any once-pending motions not considered because of the general dismissal of the complaints.

Each side shall bear its own costs on this appeal.